Good afternoon, Your Honors, and may it please the Court. My name is Matt Knepper, and I'm appearing on behalf of the appellants in this matter, and I'll at least attempt to reserve five minutes of my time for rebuttal. One of the central policies underlying the Fair Credit Reporting Act is the accurate reporting of consumer credit performance. I had trouble. What's the inaccuracy? I was having trouble finding that. Okay, so the inaccuracy occurs across sort of four spectrums. With regard to the ShellPoint account, the one that stands out the most, what the inaccuracy is is a post-discharge reflection of an ongoing account balance that reported for roughly a year and a half. That account balance... That's those lines at the bottom, right? Yes. Because the actual rest of it says zero balance. Yes, in other elements of the trade line, it does reflect a zero balance. But what is important to note here is that that actual account balance to the dollar appears later on the face of a desktop underwriter report and, in fact, also a consumer report that TriPoint, the mortgage lender that the Florence has tried to secure financing with... They say in their briefs, and I assume they're going to tell us, that that actually is not published to potential creditors, and you're saying that's wrong. I'm saying that that's likely wrong, certainly a disputed material fact for the court below. But they did actually argue that in the response brief. We supplied, with the further excerpts of record, a declaration in another case from the Northern District of Illinois in which the same deponent that we had in Mrs. Florence's case, Mary Muffin, in this case called PAPA, she had testified that the account history reporting actually does report, or they do use it for various matrices in publications to third parties. And so because that is information that, at least in other contexts, has appeared on matrices that Experian provides to its... What did you mean by the underwriter report? What was that? Okay, so Desktop Underwriter is a program that Fannie Mae uses in order to evaluate whether it's willing to, or at least to red flag potential applicants for underwriting for a Fannie Mae loan. That program takes, effectively, the information that the lender receives from the consumers on the face of a consumer report, and then breaks down the data into more specific segments that are particularly interesting, or at least threshold issues for Fannie Mae in terms of underwriting a loan. In the case of the ShellPoint account, what the TriPoint deponent testified was that the appearance of both the account balance to the dollar on the ShellPoint trade line specifically, reporting in an amount over $700,000, along with the judgment, both of those were significant problems, to paraphrase, for the Florences in terms of their willingness to underwrite. But those were not inaccurate, in a sense, looked at historically. The judgment's a different question. We'll deal with that later. But the $700,000 balance at the beginning of the bankruptcy was accurate. That's right. What wasn't accurate, you say, is that you're still claiming it shouldn't be there, as I understand it. But it's not inaccurate. But the strongest claim of inaccuracy you have is that she still owed whatever was shown in this line in 2015. That's right. Is that, did that show up on the underwriting report? Well, whether the, certainly the account balance appears on the underwriting report. I understand that the account balance does, because the account balance is there as a historically accurate statement at the outset that she owed that money. I don't know if it's on this actual, yeah. Where does that amount appear on the report, on the document that you have here? Well, and Your Honor, if, are you asking where does the account balance appear on the face of the report of the investigation to the Florences? Okay, so it appears, it appears under the trade line for Shell Point. We excerpted that into the opening brief. So in the main, there's sort of two segments. The main segment, and then below that, a running monthly balance for about 15 months in 2015. And it's in that monthly reporting that you see that account balance, which of course doesn't decline over that same period. And it's that exact balance that appears on the face of the desktop underwriter program that ultimately TriPoint was referring to in the process of determining whether to proceed with underwriting the loan. Now the reason that that, and I also understand Your Honor to, you know, identify this as at least at some level a historically accurate reporting. But that historically accurate reporting ended at the moment that the Florences filed for their petition. Once they did, they had proposed plans ultimately confirmed in which they had proposed and paid the Shell Point. That's the part I don't understand. Okay. They did at the time they filed have that debt. So why isn't that historically accurate? It's historically accurate until the impact of the bankruptcy itself. One thing that is perhaps an axiom for bankruptcy, consumer bankruptcy, is the reordering of the debtor-creditor relationship. This Court has consistently said that a confirmed plan of reorganization is in effect a court-ordered contract. And when we're construing what looks like payment performance for the period of reporting at issue, we need to look at the underlying terms. And here that would be the confirmed plan of reorganization, where the terms called for the surrender of the collateral to each of the secured lenders, Shell Point, SPS, and SINLAR, they were paid. They were paid pursuant to the plan. And certainly in the case of a discharge after that payment, the surrender of their primary residence and a rental property, that could no longer be historically correct. It could be paid. Now, I'm having trouble with that. This may be semantic, but history is history. What happened yesterday happened yesterday. And what happens today may be different, but what happened yesterday still happened yesterday. I'm hearing your argument saying what happens after that earlier period didn't happen anymore. That doesn't make any sense to me. And what we're not arguing for, Your Honor, is the idea that the pre-petition reflection of the debt obligation, that that too has to go to the wayside, or in a different sense that the credit reporting agencies can only report that which is positive for all history. What we're saying is that at the point of petition moving forward, and this is consistent, of course. Certainly from the point of petition, you didn't, nothing had changed. The point of the confirmation, there were three relevant points. The point of petition, the point of confirmation, and the point of discharge. I mean, obviously your argument is strongest at the point of discharge. But before that, why wouldn't it be historically accurate to report that there was a debt of X amount, but there was a confirmed plan of why, that she's going to pay Y, and she's been paying that. Isn't that historically accurate? It's historically accurate to the point at which they filed the petition. But let me illustrate this point for you. What we're talking about, as I understand your question, is what happens to the historic, what constitutes not historically correct reporting from the point of petition to the point of plan confirmation, and then again the second segment from the plan confirmation to the discharge. With that in mind, the reason that the first of the two periods would not accurately reflect derogatory payment history reporting, for example, the Shell Point and Sunlark trade lines, is because it is a materially misleading report to suggest that the Florences failed to meet their payment obligations pre-petition, and then a second time during the pendency of their plan payment period, which they have to begin paying from day one with the proposal of the plan, ultimately it gets confirmed in whatever form it may. And so it suggests that they not only failed pre-petition, but also failed during the pendency of the plan payment period, and failed to meet their obligations under that proposed plan. That's misleading. If you're reading that, it depends exactly how they report it. I mean, if they report meticulously, accurately, i.e., they went into bankruptcy with X debt, they promised to pay Y debt with the following plan, and they did it, is that derogatory information? That's impermissibly derogatory information? It is impermissibly derogatory information if it does not accurately reflect the actual performance for the Florences during that period pursuant to the plan of reorganization. It does. Didn't it? Did it say anything that said that they didn't – did it say they had a confirmed plan during that period? When you say it, I think – are you saying did the consumer report reflect that they had a confirmed plan? Yeah. No. The consumer report did not reflect that they had a confirmed plan. There's sort of two periods of reporting, one indicating and included in Chapter 13 bankruptcy, which should ultimately update it to discharge to indicate its discharge in bankruptcy. But that's not what it – the trade line for the Florences, any of them, reflected. The fact of the matter is, is that if Experian or by extension any data furnisher is going to report or attempt to report consistent with the payment performance of a Chapter 13 debtor through the fluid environment of a Chapter 13, they take that risk upon themselves, but they need to report it accurately. Reporting, for example, on day one or the first month or the second month of a Chapter 13 bankruptcy that they are 90 days late is academically impossible. They can't be 90 days late under their obligations pursuant to a plan of reorganization two months into a plan by reflecting the payment history that indeed they're 90 days or 120, et cetera. Of course, that's what happened here with the SPS and the SEMLAR trade lines. Shell Point's the different problem because it's the post-discharge reporting. And so the second piece is what happens after plan confirmation up to the point of discharge. The plan confirmation, particularly on the facts in this case where we have a surrender of the underlying collateral in payment for each of these creditors, what happens there is they've been paid. There's nothing further to report. Perhaps what they do is they try to convert the unsecured portion of an undersecured – Isn't that just equivalent to a foreclosure? It may be equivalent to a foreclosure, but again, is – Would it be accurate if somebody – if there wasn't a bankruptcy and there were a foreclosure and it said there was a foreclosure and they got the house back, would that be inaccurate? That would be accurate if it also reflects the fact of a zero balance, no post-petition payment history. And here, in fact, that was the case with the Shell Point trade line. We haven't disputed the entry of foreclosure proceedings started regarding Shell Point. What we disputed was the ongoing post-discharge balance amount. Yes, but you keep wandering around. I mean, that seems to me to be your strongest argument. But you're also arguing from the point of the original petition and while the plan confirmation was there, even though this is all later and the balances are going to show the balance as of post-discharge. And some of them show zero accurately and others don't. The Shell Point one says 731,619 reason balance. That's wrong. Right. That is correct. It was not only patently inaccurate, but it was materially misleading, to go to your point. Not only was it materially misleading for the reasons I discussed before, sort of this reflection of a failure in the payment obligations, both pre- and post-petition, on plan – on either one of the trade lines, but it was also materially misleading because it failed to conform with the very industry guidelines that Experian helped to create. And Experian suggests that those particular guidelines are a mere suggestion for them, but we know that it has a greater impact on the way in which future credit decision makers review that information. Had they reported consistent with those guidelines and we recreated what that reporting should look like for you in an excerpt in the reply – You know, you're down to about two minutes. Did you want to save time? Thank you. You know, Your Honor, I will reserve on – if I can just finish up briefly. And that is that the information that that – those guidelines indicated should have reported was nothing during the pendency of a bankruptcy, perhaps reflecting the realities of the bankruptcy. May it please the Court, Mayor Fetter for Experian. I want to just touch briefly to start on the notion of reporting the payment history within a bankruptcy. You know, I think that there have been a bunch of cases within this circuit and in many district courts that have dealt with – But this one's different because it involves post-discharge reporting. And you're basically ignores that. So I – and that's why I just wanted to touch briefly on the first part because I do want to get to the shell point. And all I wanted to say about the others is that I don't – you know, there are different arguments even as to post-confirmation because the debt does still exist and that's been litigated in other cases. Here, where there's no confirmed plan, you can't be reporting how someone is keeping up with the plan until there's a plan that's actually confirmed and in place. That's all a different case because in this case, we know they don't conform to their plan. Right. And in this case, so as to those, it doesn't end up misleading anybody because you get all that reported as clear to anyone reading it. This is something that was included within the bankruptcy and that was – and it was, you know, successfully discharged. But let's talk about the shell point because that part I understand is confusing. And I think that maybe the simplest way to say it is that on the shell point, they are suing the wrong people. The notion – the record makes clear that the erroneous information that their mortgage originator got, TriPoint, cannot have come from Experian. There is a – Well, I'm looking at the credit report, though, and – or a credit document, which you say isn't the credit report, but it has a whole set of lines that say that in September 2015 – August 2015, June 2015, $731,619 and had monthly obligations of $4,561, and that's wrong. But there is unrebutted information in the record most clearly at pages 46 and 50 of the excerpts of record that that is purely sort of private informational content that goes only to the consumer, that that – and this is unequivocal in these declarations – never – that information was never provided to a third party. So this – and – but I want to take it further than just those declarations because the plaintiffs are trying to create an inference from saying that there was an error in the ultimate thing that TriPoint was looking at, that unlike Experian's re-investigation report that showed a zero balance was showing an existing balance with numbers that match up to these. But there was a lot of testimony about this by the TriPoint witness here. They – unfortunately, I had to go back and – unfortunately, I didn't find the document in the excerpt of record. It helped me to look at the exhibits to the deposition to Mr. Turner. In the document that he was looking at that had the erroneous information about ShellPoint, there is a column that shows the source – their sources of information for that trade line. It lists three sources – Equifax, Experian, and TransUnion. He was specifically asked, can you – and actually, if you look at the document on this trade line where it lists the sources, there's sort of a Bates-type number under Equifax and then nothing under Experian and TransUnion. There wasn't testimony about what that means. But basically, he was asked, can you tell from anything here whether this bad information came from Experian? And he testified that no, he could not. This is at page 1069 of the excerpts. And what seems – I'm going to tell you what I think obviously happened and then what is relevant from a summary judgment standpoint. It seems obvious that whereas Experian, as we can see on the reports at ER 259 and 1201 in the part that does go to creditors, had corrected this to a zero balance. Presumably, although they didn't depose Equifax and TransUnion in this case, so we don't know, presumably the bad information came from one of the other credit reporting agencies that had not made the correction or had not made it yet. But, you know, so all we – so that's undoubtedly what happened. That's my inference. But then the question from a summary judgment standpoint is, could they go to a jury on a causation theory where the unrebutted evidence is that Experian never sent this information to any third-party creditor? Well, can you tell me again where that – where in the record it says that they never sent it to Mr. Florence, one declaration as to Mrs. Florence? Okay. And I should mention also there's a counsel referred to a document that he put in out of – as part of a request for judicial notice. I don't think it actually meets the judicial notice requirements, but even if it did, if you look at that, which is this additional Merrimethvin declaration, in describing one sort of, you know, unique or rare type of report that could actually draw from this information in the bottom, if you continue reading down on page six of that declaration, she says unequivocally, again, Experian doesn't provide account history information that's this information in connection with an application for new credit. It's only in – like, there's some limited thing used only for existing customers, so for a new credit application, that would be the situation you have here. Even that additional thing they're trying to put in just actually confirms that this doesn't get provided on a credit report of this sort to a creditor for a new loan. It isn't included – it might be included for an existing creditor. MR. ZUNIGA. She's saying that there's a rare case where it could be included for an existing – this is in another case that I haven't seen, so I don't know about it, but even looking at that and without knowing about it, she's describing very clearly a sort of rare usage of it and making clear it would have no application here. So you have this purely – or private or informational information that unequivocally – MS. GOTTLIEB. It's a little weird because somebody looking at it would have no way of knowing that. MR. ZUNIGA. It is a little weird, and I – don't take me to be suggesting that I think this was the ideal result of the way everything could have gone best. I suspect if they had submitted another letter and said you didn't get that part, they would have fixed that part, too, even though it doesn't affect any credit reports that go to creditors. There's still no reason not to address it, but, of course, they didn't. They just filed a lawsuit. And – but then in the lawsuit where you have to show that actual damages were caused and you have, at best, no basis for saying that that wrong information that they say affected them came from Experian and, in fact, information unrebutted that makes clear that it couldn't have come from Experian and must have come from one of the other credit reporting agencies. I don't know if they wrote dispute letters to the other agencies or not. Whatever erroneous information Experian had in the first place, the others would have had, too, from the same creditor. So unless they had gotten dispute letters and corrected it, then they would have continued to have it erroneous. And, you know, the last thing that's worth mentioning, although I don't think you need to get to it because this, as I say, can't have come from Experian, is the same tri-point witness also made it pretty clear that these were not people who could have qualified for a mortgage through them anyway. He said, you know, looking – this is at 1078 – looking at the multiple mortgages included in a bankruptcy and or foreclosures, in addition to a significant judgment outstanding, that would have the appearance of someone that would not be readily available for financing without further investigation and documentation request. And that's where they ended up with the further investigation and documentation request, because remember, you have this 300,000-plus judgment on the record also that is going to prevent them from getting a mortgage, in addition to the multiple real estate properties not so long ago discharged in bankruptcy. And so, you know, that's an additional reason why, you know – I don't think so. Thank you. Thank you, Your Honor. And you've saved a little time. Thank you, Your Honors. Let me first address the idea of damages, because the fact of the matter is that going back to this Court's decision in 1995 in the Guimon case, the Court expressly declined to reach the issue of whether publication to a third party is necessary to establish damages under the Fair Credit Reporting Act. But it did identify emotional distress damages as something that is available to a plaintiff under the Fair Credit Reporting Act. Under 1681i, the reinvestigation provisions, the reality is that a consumer has a right to dispute the information and have that inaccurate information removed from the report. When experience says that there were multiple mortgages that were reporting, you know, several derogatory items of information, that was show point. No, but what they're saying, as I understand it, is that this information that appears on the bottom was not, in fact, communicated to anybody. There is a deposition saying – a declaration saying that. On the other hand, your clients did see this in some way that isn't all that clear, so where does that leave us? Well, where it leaves us is that – and to your point exactly – is that when the reinvestigation came back to them, what it showed was the exact account balance that they later saw reflected on the face of the documents. That try point was telling them that amount of money or that amount of past due balance, in addition to the other mortgage accounts at issue in this case, was causing them a significant obstacle to proceeding with their credit. Consumers are not sophisticated credit experts who can distinguish these things. In fact, this information comes out after, you know, a significant litigation in this case. This idea of whether it was or was not the source of the information we actually saw on the face of those consumer reports. But the point here is that the Florences had no way of knowing the difference because when they received their report of reinvestigations back from Experian, that information was on the face of those reinvestigations, and that's the same information they saw when they suffered the emotional distress that flowed directly from it. Okay. Thank you. Thank both sides for their arguments. Florence versus Experian information solutions now submitted for a decision.
judges: Tashima, W. Fletcher, Berzon